# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 30, 2011 Session

## STATE OF TENNESSEE v. WELDON CHRISTOPHER FRAZIER

**Appeal from the Criminal Court for Knox County**
**No. 88105    Bob R. McGee, Judge**

**No. E2010-01822-CCA-R3-CD - Filed June 5, 2012**

The Defendant, Weldon Christopher Frazier, was found guilty by a Knox County Criminal Court jury of two counts of aggravated sexual battery, a Class B felony. See T.C.A. § 39-13-504 (2010). The trial court merged the convictions and sentenced the Defendant as a Range I, standard offender to eight years' confinement. On appeal, the Defendant contends that the trial court erred by (1) denying his motion to suppress his initial statements to the police, (2) not granting a mistrial after a witness for the State mentioned polygraphs, plea negotiations, and used the word "confession" to characterize the Defendant's statements to the police, and (3) refusing to give a jury instruction regarding his not fleeing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Weldon Christopher Frazier.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Steven W. Sword, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to incidents involving the Defendant and the daughter of a woman with whom the Defendant shared a home. The Defendant was charged with four counts of rape of a child and five counts of aggravated sexual battery. At the trial, the victim's mother testified that the Defendant was a family friend whom she had known for eleven or twelve years. She treated the Defendant like a brother and was not romantically involved with him.

After her divorce, the Defendant offered to help her financially and with her children, and she allowed the Defendant to move into her home. She said that her and her children's bedrooms were on the main floor of her home and that the Defendant slept in the basement. She said her children loved the Defendant and enjoyed spending time with him.

The victim's mother testified that on December 26, 2001, she took the victim to the emergency room after the victim fell and hit her head on the driveway. They returned home around midnight, and she dressed the victim in the victim's favorite pajamas and put the victim to bed. She said that the pajamas were clean and that the victim wore underwear beneath the pajamas. She said that the doctors at the hospital told her to wake the victim every two hours but that she had to leave for work around 1:30 a.m. She worked as a bail enforcement officer. She said the Defendant offered to watch the victim while she was at work. When she returned home to check on the victim, she saw the Defendant and the victim in the victim's bed. She said that the Defendant was "snuggled up behind" the victim as if he were "spooning" her and that the Defendant's pants were partially unzipped and his hand was tucked in the front waistband of his pants. She said the victim was covered with blankets and appeared to be sleeping.

The victim's mother testified that she was scared because the Defendant had never slept in her or her children's beds. She said that the Defendant was a light sleeper but that he acted groggy and unusual when she attempted to wake him. She said that she asked the Defendant why he was in the victim's bed and that he replied he was in the bed because he knew the victim would need her medicine soon and he wanted to keep a close eye on her. She said that she told the Defendant she would administer the victim's medication but that he told her she should go to sleep and he would watch the victim. She said that her cell phone rang and that she asked the Defendant to get the phone for her. She said she looked under the covers when the Defendant left the room and saw that the victim was naked from the waist down and that the victim's pajama shirt was unbuttoned to expose her torso. The Defendant returned, gave her the phone, and went downstairs to his bedroom.

The victim's mother testified that the call was from her boyfriend, Mike Smith, and that she told Mr. Smith to call the police. The police and Mr. Smith arrived at her house about fifteen minutes later. She told the police what she saw in the victim's bedroom, and they escorted the Defendant out of the home. She said she and the police woke the victim, who was still undressed, and took the victim to the hospital. The police took the victim's pajamas. She said she did not immediately ask the victim what happened because she did not know what to think about the situation and because the victim was "scared to death" after being awakened by the police. She said the victim did not indicate that anything happened with the Defendant.

The victim's mother testified that about two months later, she found a pair of the Defendant's underwear beneath the victim's bed. She said that there was no reason the Defendant's laundry should be in the victim's room and that she threw the underwear away.

On cross-examination, the victim's mother testified that when she first met the Defendant, she knew he had served in the National Guard with her father. She agreed that her children cared for the Defendant and that he cared for them. She agreed the victim was covered in blankets when she first saw the victim but said she had never known the victim to remove her clothes while in bed. She did not know how the victim was positioned under the covers. She agreed that the Defendant was on top of the blankets on the victim's bed and that she and the police found the victim's underwear beneath the blankets. She agreed a blanket belonging to the Defendant was also on the bed but did not know if it was there when she put the victim to bed.

The victim's mother agreed that when she left for work, she knew the Defendant would be checking on the victim every couple of hours throughout the night. She said the Defendant was on the victim's bed when she saw him, not on the floor. She did not know if the victim told doctors at the hospital that she was not raped. She stated that whenever she asked the victim what happened that night with the Defendant, the victim said she could not remember. She agreed the victim spoke with the Department of Children's Services and told persons there that she could not remember what happened.

The victim's mother testified that it was her idea to call the police. She said Mr. Smith never threatened her. She did not remember the Defendant's confronting her after one of her children found marijuana in her bedroom or blaming the presence of the marijuana on Mr. Smith.

The victim's mother testified that Shane Cooper told her the Defendant confessed and that he mentioned a few things from the confession but that he did not read the Defendant's statements to her. She agreed that an earlier incident of sexual abuse involving the victim occurred in 1998 and that the victim told her about the incident. She said the victim was not punished for revealing the abuse. She agreed that the earlier incident involved a teenage relative of the victim. She said that the relative pled guilty in juvenile court and that the victim never testified regarding the incident.

The victim, sixteen at the time of the trial, testified that she was eight years old in December 2001, when she lived with her mother, brother, and the Defendant. She said that she met the Defendant when she was five or six years old and that she had a good relationship with the Defendant while they lived together. On December 26, 2001, she fell and hit her head. She agreed that when she got home from the hospital, she dressed in her

-3-

pajamas and underwear and went to bed. Her mother had to go to work that night, and the Defendant watched over her while her mother was away. She said the Defendant came into her room that night, took off her clothes, took off his clothes, and climbed on top of her. She said he kissed her on her neck, breasts, and vagina. She said that the Defendant attempted to place his penis in her vagina and that it was painful. She said that she told the Defendant to stop and that he eventually did. She said he did not speak during the encounter. The next thing she remembered was the police waking her. She said the only clothing she had on when the police woke her was an unbuttoned shirt. She said she never got hot at night or took her clothes off while sleeping. She said she "froze" at night.

The victim testified that she was examined at the hospital. She said she told the doctors that nothing happened because she did not know what had happened, because she was scared, and because she thought she would get into trouble. She said the incident on December 27, 2001, was not the first time the Defendant touched her sexually and estimated that the Defendant touched her sexually twenty times. She said that she was six years old the first time the Defendant touched her and that he grabbed her hand while she slept and placed his penis on her hand. She said that she pulled her hand away and that the Defendant left her bedroom. She said that at a later date, the Defendant came into her room while she slept, climbed on top of her, and attempted to place his penis in her mouth. She said that she kept her mouth closed but that the Defendant's penis touched her lips and teeth. She said that on another occasion, the Defendant asked her if she wanted a massage, that she said yes, and that he instructed her to take off her clothing. She said the Defendant rubbed her legs, back, arms, and buttocks. She said that at a later date, the Defendant climbed into bed with her and rubbed her breasts and vagina through her clothes. She said that on another occasion, she sat on the Defendant's lap while she was naked. She said the Defendant lifted her up "in sort of a piggy back ride, but I was facing him. And he walked though the house while licking my vagina." She said that the Defendant made her watch pornography with him on another occasion and that he rubbed her buttocks, vagina, and breasts. She said that on two occasions while the Defendant drove her and her brother to school in his pickup truck, the Defendant rubbed her vagina beneath a jacket that covered her lap. She said her brother could not see the Defendant touch her. She did not remember the most recent date on which the Defendant touched her before the incident on December 27.

The victim testified that the Defendant told her not to tell anyone about their sexual encounters because it was their "little secret." She said that for a long time, she lied and told people she did not remember anything that happened. She said that she remembered the encounters with the Defendant and that she would never forget them because they hurt "deep down."

On cross-examination, the victim agreed that she went back to sleep after the Defendant touched her on December 27, 2001. She did not remember if the Defendant asked her what her name was when he came into her bedroom. She did not remember going to the hospital that night but remembered speaking with the police officer who woke her. She did not remember telling anyone that the Defendant came into her room and asked her questions or that the only place the Defendant touched her was on her foot. She did not remember speaking with the police or Department of Children's Services personnel or if she told them that she did not remember the incident because she was asleep. She agreed she was best able to remember events shortly after they occurred.

The victim agreed that in 1998, there was an incident involving a family member who touched her with his penis. She did not remember if she told her grandmother about the 1998 incident but said she would not be surprised if records showed that she told her mother, grandmother, and a doctor about the incident. She did not remember if the family member was arrested, if she got in trouble, or if she attended counseling after the incident. She said she did not tell anyone about the incidents with the Defendant because she was scared. She said she thought the Defendant's pickup truck had a manual transmission and agreed that the Defendant touched her vagina while her brother sat next to her in the truck. She did not mention the touching to her brother. She agreed that the Defendant attempted to place his penis in her mouth while she slept and that he gave her a massage while she was nude but said she did not know which incident occurred first. She agreed that she watched a pornographic movie with the Defendant but did not know if the video player in her room was the only way to watch a video in her home.

On redirect examination, the victim testified that no one threatened her or told her what to say regarding the incidents with the Defendant. She said her testimony was based on her memory of what happened. On recross-examination, the victim testified that she and her mother had not discussed the incidents. She agreed that numerous people attempted to ask her about the incidents, including her mother, grandmother, and the police.

Shane Cooper testified that he worked as an investigator for a law firm and that he previously worked as an investigator with the Knoxville Police Department. He said he investigated the incident involving the victim on December 27, 2001. He went to the hospital and spoke with the victim, the victim's mother, and the doctor who examined the victim. He said the victim was withdrawn and stated she did not remember what happened. He said it was common for a child victim not to disclose immediately that abuse occurred.

Mr. Cooper testified that he left the hospital and returned to the police station, where the Defendant was waiting in an interview room. He entered the room, introduced himself, offered the Defendant a drink and use of the restroom, and asked the Defendant if the

Defendant knew why he was there. He said the Defendant responded that he was at the police station because something occurred at the victim's home. Mr. Cooper asked the Defendant to write a statement explaining what happened during the past couple of days. He said that he did not tell the Defendant what to write and that he left the room while the Defendant wrote the statement. He said he asked the Defendant to write a statement because he had very little information or evidence about the incident.

In the statement, the Defendant stated that after he arrived home from work around 11:30 p.m., the victim's mother and her friend April decided to go out for a few hours. The victim's mother asked the Defendant to wake the victim every two to three hours and left around 1:15 a.m. He said that the victim called him into her room around 1:20, that she asked for a drink and a neck massage, and that he provided both. He left her room a few minutes later, set his alarm for 3:20, and fell asleep on the floor near the dining room table. He said that after his alarm went off, he returned to the victim's bedroom and knelt next to her bed. He said he shook her shoulder and asked the victim her name, her age, and what grade she was in. The victim provided the information and he told the victim to go back to sleep. He said he set his alarm for two hours later and fell asleep with his head lying on his hands on the edge of the victim's bed. He said the next thing he remembered was the victim's mother waking him. They attempted to wake the victim but were unable. He said that he told the victim's mother he woke the victim at 3:20 and that she told him not to worry about waking the victim. He left the room and went downstairs to sleep. He said that the next thing he remembered was three or four officers standing over him and telling him to get up and that he asked them what was happening.

Mr. Cooper testified that persons often had "trouble" telling the truth in a written statement and that his normal practice was to go through a statement line by line to see if a suspect left anything out that he knew to be a fact about an incident. He said he would interrogate a suspect about anything that was omitted from the statement, confront a suspect with facts, and attempt to learn the truth. He said the Defendant's initial statement conflicted with the information provided by the victim's mother and did not mention anything about the Defendant's touching the victim inappropriately. He said that Officer Starr Perrin joined him and that they returned to the holding room to confront the Defendant about discrepancies between his statement and the information provided by the victim's mother.

Mr. Cooper testified that he and Officer Perrin explained the Defendant's <u>Miranda</u> rights and that the Defendant signed a waiver of those rights. He said they did not raise their voices while speaking with the Defendant. He said they told the Defendant that based on information from other people, they knew the Defendant left things out of his statement and that he needed to tell them what happened. He thought they told the Defendant about the victim's being found naked from the waist down, but he was not sure. He said that within

ten to fifteen minutes, the Defendant "broke down," began crying, and confessed that he remembered "licking" the victim and attempting to penetrate her with his penis. He said that he asked the Defendant to write an additional statement to accompany his original statement but that neither he nor Officer Perrin told the Defendant what to write or suggested words to write. He identified the Defendant's second statement and read it to the jury:

> I then bent over and kissed her and started to put my hand on her shoulder but I did not. I put my hands on her clothing and pulled it off of her. I then got undressed and got on top of her and started kissing her mouth. We touched tongues and I felt her vagina getting wet and I started having sex with her.

> I put my penis into her vagina (I think) - I did not look to see where I was putting it. At first my penis hurt and felt like it was bending in half. While this was happening I started to kiss her breasts and licking them. She put her arms around my head - I think to try to push me off. After a while I stopped and pulled my penis out of her and she pushed my head away and I started to lick her vagina - I think I was hearing her say, oh! baby! but I think I was dreaming it. She turned over and put her butt into the air and I said that she needed to go back to sleep and I do too (I don't know if I ejaculated, but it felt good). I have never had sex before because I had never had a girlfriend. I have masturbated before but it didn't feel the same.

Mr. Cooper testified that the Defendant confirmed that the statement reflected what had happened and then signed the statement. He said that the Defendant also consented to a search of his home and that they allowed the Defendant to leave the police station. He said that evidence was seized from the home but that it was not analyzed until 2003 or 2004 because the police believed they had a truthful confession from the Defendant and there had been discussion of a plea agreement.

Mr. Cooper testified that the Defendant came to the police station a few months later and stated he wanted to recant his confession and give another statement. He said that he asked the Defendant to write the statement and that the Defendant did so after signing a waiver of his Miranda rights. The statement was not recorded. He said that he left the room while the Defendant wrote the statement and that he did not tell the Defendant what to write. He read the statement to the jury.

In his third statement, the Defendant gave a version of events similar to his first statement but added that when he went to check on the victim around 3:20 a.m., he became frantic when the victim did not respond to his calling her name. He said he "yanked" the covers off of her and noticed that her pajama bottoms were off. He said the victim occasionally took off her clothes when she was hot. He said that he did not check to see if the victim was wearing underwear and that he covered the victim with the blankets. He said that he laid his head on the side of the bed and fell asleep and that when the victim's mother woke him, he did not think to tell her about the victim's not wearing pajama bottoms because the victim's mother "knows how her daughter is, and I really did not think anything about it." He said he confessed to raping the victim because

> at first I was confused about everything . . . [Mr. Cooper] said that [the victim] was found in bed with her pajama bottoms and her panties off and had been raped. I was shocked. He then asked me if I had anything I needed to say to him and I shook my head no. Later that morning Mr. Cooper and another investigator came into a room and told me to write a statement about that night. I did and they read it then came back in stating that I was missing something and that I was covering up something. They said that they were not stupid and that they had already talked to the doctors, [the victim's mother, and the victim]. The lady investigator said that I needed to be a man about it and admit what I did to [the] "poor [victim]." She said that I did not want [the victim] to have to take the stand and tell everyone what I did to her. I said, "no, I didn't." I was broken hearted and I started doubting myself into thinking that maybe I did do something. So I confessed to raping her even though I couldn't remember anything. I only put down what the lady investigator had suggested when she asked me questions. The only thing in my mind was that if I had really done this, then I deserved to die! I was going to kill myself. But now, having had time to think about that night, I know that I could not have done anything to [the victim]. I love [the victim's mother] and her family too much to hurt them in any way. I even vowed to [them] that I would kill anyone that hurt them, even if that meant going to jail for life!!

Mr. Cooper testified that he read the statement, returned to the room where the Defendant sat, and asked the Defendant if he would be willing to take a polygraph test. He did not think he questioned the Defendant about the statement. He said that in June 2004,

the Defendant provided DNA samples and that the samples and other evidence were sent to the Tennessee Bureau of Investigation (TBI) for analysis.

On cross-examination, Mr. Cooper testified that when the Defendant was first brought to the police station, the Defendant would have been allowed to leave had he requested to do so. He said the patrol officers who responded to the victim's home decided to handcuff the Defendant and bring the Defendant to the police station. He said that he did not know if video cameras were in the room in which the Defendant wrote his original statements and that cameras were not in every interview room. He agreed he could have recorded the Defendant's statements using a video recorder or an audio recorder, but he said his standard practice was to have a statement either be recorded or written, not both. He said he preferred written statements when he had little physical evidence because he could use an investigative technique called statement analysis. He agreed a written statement would not reflect what was said in an interview room. He did not recall if he moved the Defendant from one interview room to another, but he said he did not think they changed rooms.

Mr. Cooper agreed that he asked the Defendant to write what happened between 6:00 p.m. on December 25, 2001, and the time the police arrived at the victim's home. He said he left the room while the Defendant wrote the statement because he did not want the Defendant to think that he was pressuring the Defendant to write anything. He agreed that he spoke to officers who responded to the victim's home, the victim, the victim's doctor, and the victim's mother before speaking with the Defendant. He agreed that the victim told him she did not remember what happened and that the victim's doctor told him no evidence of penetration was found. He said the victim's mother told him that she found the Defendant in the victim's bed "with his frontal area against the back" of the victim and that the victim was nude from the waist down beneath the covers. He agreed that he did not feel it necessary to advise the Defendant of his Miranda rights before the first statement but that it was possible the Defendant could have provided incriminating information in the first statement.

Mr. Cooper agreed that after he read the Defendant's first statement, he returned to the interview room to "clear up discrepancies." He agreed he told the Defendant something similar to, "you've left some things out." He agreed the only discrepancy between the Defendant's original statement and the information he learned before speaking with the Defendant was that the Defendant was found in bed with the victim and that she was nude from the waist down. He said the Defendant signed a Miranda waiver at 10:54 a.m. on December 27, 2001. He said he and Officer Perrin did not leave the room while the Defendant wrote the second statement. He said that he believed the Defendant was truthful in the second statement and that he was not aware of an innocent man confessing to him about committing a crime. He agreed the Defendant was allowed to leave the station after

providing the statements. He said that the Defendant was allowed to collect his belongings from the victim's home but that the Defendant was not allowed to stay at the home.

Mr. Cooper agreed that an investigator with the Department of Children's Services spoke with the victim on December 28, 2001, and that he attended the interview. He agreed the victim remembered which pajamas she wore that night, taking Motrin with Gatorade, and being woken and asked what her name was and where she attended school. He agreed the victim said she did not remember any sexual activity. He did not verify that the victim's mother left to attend to bail enforcement activities in the early morning hours of December 27 or speak to the woman the Defendant stated was at the home with the victim's mother that night. He agreed that officers at the scene collected evidence and that the Defendant provided DNA swabs.

Doctor Gerald Blossom, an expert in pediatric medicine, testified that he worked as a pediatrician in the children's hospital emergency department. He examined the victim on December 27, 2001, and the victim seemed "very calm and unbothered by the whole thing." He said the victim played with dolls and did not seem upset. He said the physical exam was normal, with the exception of minor inflamation in the inter labial area. He said the redness was a "nonspecific finding" because it could be caused by trauma, injury, someone touching the area, moisture from urine in the area, or friction caused by walking. He was unable to determine if the victim was sexually abused. He said that it was possible to penetrate the vaginal opening of a prejuvenile girl without leaving any "medical signs" but that it was not common.

On cross-examination, Dr. Blossom testified that other than redness in the victim's vagina, there were no other abnormalities. He agreed that redness may not be an abnormality and that it could occur in females who were not abused. He agreed he stated in his medical report that the redness seen on the victim was within the normal range for a child of her age.

On redirect examination, Dr. Blossom agreed that the redness seen on the victim could be consistent with a female who had her vagina licked or her labia penetrated. On recross-examination, Dr. Blossom agreed that the redness was also consistent with a female who had no sexual contact.

Gerald Smith testified that he worked in the forensics unit of the Knoxville Police Department, primarily at crime scenes. He photographed the victim's home and collected the sheets and blankets from the victim's bed, a pair of underwear and pajama bottoms found on the victim's bed, and a tissue or paper towel that was on the floor near the victim's bed. He said that he examined the items for evidence of bodily fluids and that his tests indicated

the presence of semen. He repackaged the evidence and delivered it personally to the TBI for analysis. He also delivered DNA swabs obtained from the Defendant to the TBI.

On cross-examination, Mr. Smith testified that he went to the hospital after he left the victim's home but that the doctor at the hospital told him there was nothing to photograph or collect. He agreed that his initial analysis of the evidence collected from the victim's bed did not reveal how the bodily fluids got onto the evidence. He said the evidence was sent to the TBI to confirm his presumptive tests and to rule out false positives.

Mike Wagoner testified that he worked for the Knoxville Police Department in December 2001 and that he collected DNA samples from the Defendant on June 2, 2004. He placed the samples in a sealed property envelope and submitted them to the department.

Agent Donna Nelson, an expert in forensic serology and DNA, testified that she was a forensic scientist with the TBI. She examined the DNA samples from the Defendant and the pajama pants and underwear from the victim. She also received a blanket, sheets, pillowcases, and a comforter. She said she found sperm on the victim's pajama pants but not on the victim's underwear. She said that the DNA profile of the sperm found on the pants matched the Defendant's DNA and that the possibility of another person having the same DNA profile exceeded the world population.

On cross-examination, Agent Nelson testified that she was certain the Defendant's DNA matched the DNA found on the victim's pajama pants. She said she took precautions to ensure that there was no cross-contamination between DNA samples. She agreed that DNA could be transferred from one material to another. She said that if wet semen were on a blanket, the semen could be transferred to another object if the blanket and the other object touched. She did not test the blanket, sheets, pillowcases, or comforter because she was not asked to test those items. She agreed that DNA samples were often obtained from victims of sexual assault and said that she would expect to find a suspect's DNA on the sample taken from the victim if the suspect did not wear a condom. She agreed that DNA could be recovered if a suspect left behind saliva or semen on the victim.

Charles Godfrey testified for the defense that his stepdaughter was married to the Defendant. He said he obtained copies of the Defendant's statements to the police from the court clerk's office about two and one-half years before the trial.

The Defendant testified that he had been married for five years at the time of the trial and that he met his wife before he met the victim's mother and her children in April 2000. He said that he became friends with the victim's mother and her children and that he would occasionally babysit the children. He moved into their home in June or July 2001.

-11-

The Defendant testified that he worked for Murray Guard, a security services company, and that on December 25, 2001, he worked from 6:00 p.m. until 6:00 the following morning, spent the day running errands, and returned to work at 3:00 p.m. without having slept. Later that day, the victim's mother called him while he was at work and told him the victim had a concussion and was taken to the hospital. He said he worked until 11:00 p.m. and returned home. He had an argument with the victim's mother about her boyfriend, Mike, and the Defendant's belief that her children found marijuana belonging to Mike in the house. He checked on the victim to see how she was feeling and watched the victim's brother play a video game.

The Defendant testified that April, a friend of the victim's mother, came to the home and that she and the victim's mother decided to go to a party and asked him if he would watch the children and wake the victim every two hours. They left the home at about 1:15 a.m. He said that a couple of hours later, he went into the victim's bedroom and that although she did not immediately wake up, he was able to wake her after shaking her and pulling on the covers. He said that he told the victim to go back to sleep after she answered his questions and that the next thing he remembered was the victim's mother pulling his hand and waking him from his position on the floor next to the victim's bed. He said that he fell asleep with his head and his hand on the edge of the bed and that he hit his shoulder on the night stand as he stood up. He and the victim's mother briefly tried to wake the victim, but the victim's mother asked him to get her cell phone when it rang. He said the victim's mother told him not to worry about waking the victim and suggested that he go downstairs and sleep. The next thing he remembered was a police officer shining a flashlight in his eyes and ordering him to get up. He was frisked, handcuffed, and taken to a police car outside.

The Defendant testified that the police told him they needed to ask him questions and that they took him to the police station. He was put in a small room and an officer removed the handcuffs. Mr. Cooper came into the room, and the Defendant asked Mr. Cooper what happened. Mr. Cooper told him the victim was found without her pajama bottoms or underwear and had been raped. The Defendant said he was devastated by the news because he had been in the victim's bedroom. Mr. Cooper took him down the hallway, met with a woman, and placed him in a larger interview room with a camera. Mr. Cooper gave him paper and a pencil and told him to write out "what happened at a certain time." No one told him if the camera was on, but he thought the camera was recording him. When he finished the statement, Mr. Cooper returned to the room, took the paper, and left.

The Defendant testified that Mr. Cooper and a female officer returned to the room a few minutes later and stated they had a "problem" with his statement. He informed the officers that he told them everything, but they told him that according to the information they had from the victim's mother, he left something out of his statement. He said the female

officer called him a liar and told him that he would be released if he told them the truth. He repeatedly told the officers that he was telling the truth, but they responded, "No, you're not," and told him that he would be allowed to leave if he told them the truth. The officers told him that the victim said he raped her. He said that he was "desperate" because they would not listen to him and that he "gave them what they wanted to hear." He said that his second statement was not true and that the female officer suggested what he should write. He said she asked him, "[D]id you do this? And I said, I don't know. And she went, well, put it down in your own words." He said he wrote a false statement because the officers "said they would let me out of there and I figured they would investigate and see that I didn't do anything to [the victim], and then I'd have that tape to prove that they were telling me to put it down."

The Defendant testified that he was allowed to leave and that he called a friend to pick him up from the police department. He said that he and the friend discussed what happened and that as a result of that conversation, he wanted to "set the record straight" with Mr. Cooper. He eventually met with Mr. Cooper and told the truth. He was "devastated and pissed" when he learned that his initial statements were not recorded because one of his defenses would have been to show that he was told to write false information.

The Defendant testified that he knew two reasons for his DNA being found on the victim's pajama pants. The first reason was that he found a videotape under the victim's bed on December 25, 2001, placed it in the VCR in the victim's room to see what it was, discovered that the tape contained pornography, and masturbated while sitting on the edge of the victim's bed. He said that the victim's room was the only room in the home that had a VCR and that no one was in the house while he watched the video. The second reason his DNA could have been found on the victim's pajama pants was that his blanket was found on the victim's bed. He said he did not realize his blanket was on the bed until he viewed photographs of the scene and recognized the blanket. He did not know how the blanket got on her bed and said it was on his bed the day before.

The Defendant testified that it was not possible for him to have had sexual contact with the victim in March 1999 because he did not know her at that time. He said that his first statement to the police was true and that he lied in the second statement. He said he did not rape the victim or touch her inappropriately. He said he never had any sexual contact with the victim.

On cross-examination, the Defendant testified that he did not meet the victim until April 2000, shortly after she turned seven. He agreed that he had a good relationship with the victim, that he enjoyed spending time with her and her brother, and that he cared for her

and her family. He agreed that the family trusted him and that he babysat the victim and her brother many times.

The Defendant agreed that on December 26, 2001, the victim had a mild concussion and that he was instructed to wake the victim every two hours. He acknowledged that he did not intend to fall asleep in the victim's room after checking on her and that he fell asleep while sitting on the floor with his head on the side of the bed and his back against the night stand. He said six to eight inches were between the victim's bed and the night stand, and he agreed he was still in that space when the victim's mother woke him. He agreed he did not tell the victim's mother that the victim was not wearing her pajama bottoms. He said the victim's mother lied when she said she found him on the bed with his pants unbuttoned and unzipped. He did not know how his underwear got beneath the victim's bed and stated that the victim's mother lied about finding his underwear there.

The Defendant agreed that before he wrote his statement, Mr. Cooper told him the victim had been raped and was found nude from the waist down. He agreed that when Mr. Cooper asked him if he had anything he needed to say, he shook his head no instead of saying that he never touched the victim. He agreed that Mr. Cooper returned to the interview room with Officer Perrin after reading his first statement. He said Officer Perrin told him what to write in the second statement and to phrase it in his own words. He agreed that he began crying about ten to twenty minutes after they entered the room and that he wrote out his second statement and signed it.

The Defendant acknowledged that his second statement included details about what he did and what he thought while touching the victim, but he said he "put things in . . . because [he] didn't know what to write." He said he wrote a false statement and gave the investigators "what they wanted to hear." He stated that the investigators would not let him leave until he gave them what they wanted but that he had "no doubt" at the time he gave the statement that he did not lick the victim's vagina or put his penis in her vagina. He agreed he wrote in his third statement that he "started doubting myself into thinking that maybe I did do something. So I confessed to raping her even though I couldn't remember anything." He said that despite thinking his initial statements were recorded, he decided to give a third statement after a friend told him that the police would not use the recordings. He stated that his third statement was truthful and that he was not "thinking straight" when he gave his first two statements.

The Defendant acknowledged that he did not mention in his first statement that he pulled the covers off the victim while attempting to wake her, that he noticed she was not wearing her pajama bottoms, or that the victim occasionally took off her clothes when she was hot. He agreed he wrote these items in his third statement. He said that when he wrote

his first statement, he did not think it was important to mention to the police that the victim occasionally removed her clothes when she was hot. He said the victim's mother and her nanny told him of the victim's tendency to remove her clothing, but he agreed he heard the victim's mother testify that the victim did not remove her clothes at night. He acknowledged that he did not mention in his third statement how his semen got on the victim's pajamas and that at the time he gave the statement, he did not know the police found his semen on the pajamas. He agreed he masturbated on the victim's bed on December 25, 2001, but he said that he ejaculated into paper towels and that he did not leave the towels on the victim's bed.

On rebuttal, Knoxville Police Officer Starr Perrin testified that she investigated the victim's case. She said that she read the Defendant's first statement and that she watched Mr. Cooper read the Defendant his Miranda rights before they discussed the first statement with the Defendant. She said the Defendant "broke down" about five to ten minutes into the interview, began crying, and told them what he did to the victim. She said they asked the Defendant to write a second statement and he complied. She said she did not suggest or tell the Defendant what to write in the second statement. She said she told the Defendant, "if it happened, write it down, if it didn't, don't write it down." She said she and Mr. Cooper did not raise their voices while speaking with the Defendant.

On cross-examination, Officer Perrin testified that she did not always record a suspect's statement. She said she did not use the recording equipment in the interview room with the Defendant because the camera was not functioning. She agreed the Defendant was informed of his Miranda rights after he wrote the first statement. She said the Defendant was free to leave the police department at any time and was not required to speak with the police. She said that Mr. Cooper led the questioning but that she asked the Defendant a couple of questions.

On redirect examination, Officer Perrin testified that it was "easier to spot the truth" when a suspect wrote a statement. She said that when she analyzed a written statement, she looked for changes in tense and the suspect's minimizing an incident or omitting an incident as a "clue" that the statement contained false information.

Upon this evidence, the jury found the Defendant guilty of two counts of aggravated sexual battery. The trial court merged the convictions and sentenced the Defendant as a Range I, standard offender to eight years' confinement. This appeal followed.

# I

The Defendant contends that the trial court erred by denying his motion to suppress his initial two statements to the police because he did not receive Miranda warnings before

-15-

writing his first statement and neither statement was recorded. The State contends that the trial court properly denied the motion to suppress because the first statement was not inculpatory and the second was written after the Defendant received Miranda warnings. We conclude that the trial court did not err by denying the motion to suppress.

At the motion to suppress hearing, the evidence regarding the Defendant's statements was similar to that presented at the trial. Mr. Cooper testified that on December 27, 2001, the Defendant was brought to the Knoxville Police Department but that the Defendant was not under arrest. He said that the Defendant was placed in an interview room and that he entered the room a few minutes later, introduced himself to the Defendant, and discussed the reason why the Defendant was there. He said that he did not ask the Defendant any questions but that he told the Defendant about the allegations involving the victim. He said he asked the Defendant to write a statement explaining what the Defendant had done over the past two days. He said that he left the room while the Defendant wrote the statement but that he checked the Defendant's progress and offered the Defendant a drink and use of a restroom. He said the Defendant took about twenty or thirty minutes to write the statement. He collected the Defendant's statement after it was finished and read it in his office with Officer Perrin.

Mr. Cooper testified that the Defendant's first statement did not incriminate the Defendant and that it omitted any reference to the Defendant's being found in the victim's bed and the victim's being undressed. He said he and Officer Perrin returned to the interview room within fifteen minutes of collecting the first statement and told the Defendant he did "a good job with his statement, but that he had left some parts out." He read the Defendant his Miranda rights and obtained a signed waiver of those rights. He said he told the Defendant that there were serious allegations about what happened to the victim and that "we felt like he was the one that had done something to her." He said that he and Officer Perrin continued to speak with the Defendant and that within ten to fifteen minutes, the Defendant admitted to doing "several things" to the victim. He asked the Defendant to write a second statement and told the Defendant to "write what actually happened, nothing more, nothing less." He did not recall anyone raising their voice during the interview. He said he and Officer Perrin did not tell the Defendant what to write or suggest what to write. He said the Defendant was not under arrest and was released after he provided the statements.

On cross-examination, Mr. Cooper testified that he had access to recording equipment but that he did not record the Defendant's statements. He agreed the Defendant was a suspect when he was brought to the police department but said the Defendant was free to leave without providing a statement. He agreed he asked the Defendant to write what the Defendant did from the time he left for work on December 25, 2001, until the police arrived at his home on December 27. He agreed that he could have read Miranda warnings to the

Defendant as soon as he entered the room. He said that the Defendant was not being questioned or asked about anything incriminating but that the Defendant was asked to write what he did during a specific time period.

Mr. Cooper testified that he thought the Defendant's first statement omitted information because the victim's mother told him she found the Defendant in bed with the victim while the victim was undressed and officers at the scene told him they found the victim's pajama bottoms in her bed. He agreed he told the Defendant, "You've left stuff out," rather than, "you've left some stuff out that other people had told us." He said he expected the Defendant to leave out information related to criminal activity in the first statement. He said he read the Defendant his <u>Miranda</u> rights because the situation changed from "a mere interview phase to an interrogation phase." He did not recall the questions he asked before the Defendant wrote the second statement, but he said there was a "high probability" that he made statements similar to, "you didn't tell us anything about touching her." He did not recall if the Defendant stated that he did not do anything to the victim or that he did not remember what happened. He said the Defendant mentioned that his father was a minister, began crying, and confessed. He did not remember anyone telling the Defendant to write anything other than what the Defendant had done.

The Defendant testified that he was handcuffed and taken to the police department in a police cruiser. He said he was placed in a room and an officer removed his handcuffs. He did not know how long he waited before Mr. Cooper entered the room. He stated that he asked Mr. Cooper why he was at the police station and that Mr. Cooper said the Defendant was there because the victim was found with her pajama bottoms removed and she "apparently had been raped." He said that Mr. Cooper initially said the police would not interview him because no one was present to assist Mr. Cooper but that Mr. Cooper decided to conduct the interview after encountering another officer in the hall. Mr. Cooper took him to a larger room with a camera and left to get paper and a pencil. He said Mr. Cooper returned to the room, handed him the paper and pencil, and told him to "write everything that I knew that happened" between December 25, 2001, and December 27. He said that while he wrote the statement, Mr. Cooper checked on him several times and asked if he needed a drink or anything else. Mr. Cooper collected the statement when it was finished and left the room to read it.

The Defendant testified that Mr. Cooper and Officer Perrin returned and said they "found some problems with your statement, it doesn't add up with what we know that happened." He said that he asked them what happened and that they replied that the victim was hurt and they "knew everything about what had happened that night." He said they accused him of lying after he told them that he was asleep and did not do anything to the victim. He said Officer Perrin told him, "you know what you did was wrong. You need to

be a man and admit to it." He said that he repeatedly denied doing anything to the victim and that the officers told him he could leave if he told the truth. He said he began to cry because he was unable to convince the officers that he was being truthful. He said he wrote the second statement because he thought that they would let him go if he gave them what they wanted. He said he thought the officers would investigate the crime and learn that he did not do anything.

The Defendant testified that Officer Perrin told him to write things down despite his stating that he did not remember what happened because he was asleep. He said his second statement was almost entirely based on questions from Officer Perrin. He said he was informed of his Miranda rights after he told the officers what had happened but before he wrote his second statement.

On cross-examination, the Defendant testified that Mr. Cooper did not ask any questions about the victim when Mr. Cooper first entered the room and that he asked Mr. Cooper questions. He agreed that Mr. Cooper asked him to write what occurred during a certain time span and that Mr. Cooper did not ask him to write about sexual conduct. He agreed he was willing to speak with the police and provide a statement. He said that he did not remember doing any of the things he wrote in the second statement and that what he wrote was in response to Officer Perrin's questions. He said he knew he did not do what the officers told him to write.

On redirect examination, the Defendant testified that he did not think he was free to leave the police station. He said he repeatedly told the officers that he did not know what happened. He said that when he told them he was telling the truth and asked to leave, the officers responded, "No. You need to tell us the truth and then we'll let you go."

On rebuttal, Officer Perrin testified that she entered the interview room after the Defendant wrote his first statement. She said Mr. Cooper advised the Defendant of his Miranda rights before they asked any questions. She said that the Defendant confessed within ten to fifteen minutes and that they told the Defendant, "if it happened, write it down. If it didn't, don't write it down." She said she never told or suggested to suspects what to write, including the Defendant. She said the Defendant never claimed that he only wrote what was in his second statement because they told him what to write. She said she maintained a normal tone of voice and did not curse at the Defendant.

On cross-examination, Officer Perrin testified that she did not watch the Defendant write his first statement. She said the camera in the interview room malfunctioned and was not used to record the Defendant. She said Mr. Cooper read Miranda warnings to the Defendant when they reentered the room.

The trial court denied the Defendant's motion to suppress. The trial court found that the Defendant's first statement would be subject to suppression because the Defendant was in custody and subject to the functional equivalent of interrogation when he was asked to write the statement but noted that the Defendant did not incriminate himself in the first statement. The court found that the Defendant's second statement was not subject to suppression because it was preceded by Miranda warnings and the officers told the Defendant to write what "actually happened" and did not tell the Defendant specific words or things to write. The court found that the first statement did not taint the second statement because the Defendant did not incriminate himself in the first statement and his guilty knowledge was still secret when he was read his rights and decided to waive those rights.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998).

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Miranda warnings are not required in the absence of custodial interrogation. State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (citing Miranda, 384 U.S. at 478). In Miranda, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Regarding the Defendant's argument that the statements should have been recorded, neither the federal constitution nor our state constitution require interrogations to be recorded, and our supreme court has rejected the notion that a statement is subject to suppression because it was not recorded. See State v. Rollins, 188 S.W.3d 553, 564-65 (Tenn. 2006); State v. Godsey, 60 S.W.3d 759, 771-72 (Tenn. 2001). The trial court did not err by denying the motion to suppress on this basis.

Regarding the Defendant's contention that his statements were inadmissible because he did not receive Miranda warnings before writing his first statement, the record reflects that the Defendant was deprived of his freedom of action when he wrote his first statement. Police officers woke, handcuffed, and took him to the police station for questioning. He was not told that he could leave. Mr. Cooper entered the interview room and asked the Defendant to write a statement explaining what the Defendant did during the time frame when the victim was abused. This was an action that Mr. Cooper should have known was reasonably likely to elicit an incriminating response from the Defendant. Mr. Cooper chose not to administer Miranda warnings before asking the Defendant to write the first statement because he believed the Defendant was not being questioned about anything incriminating, but he agreed that it was possible the Defendant could have provided incriminating information in the first statement. The record does not preponderate against the trial court's finding that the Defendant was in custody and subject to the functional equivalent of interrogation when he provided his first statement. As a result, the trial court erred by admitting the Defendant's first statement. However, because the first statement did not incriminate the Defendant or suggest improper activity and there was substantial evidence supporting the conviction, we conclude that admitting the statement was harmless beyond a reasonable doubt. See T.R.A.P. 36(b); State v. Koffman, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006).

Having determined that the Defendant's first statement was the result of an unwarned custodial interrogation, we must determine the admissibility of the second statement that was preceded by Miranda warnings. In Missouri v. Seibert, 542 U.S. 600, 611-12 (2004), a plurality of the Court stated that the "threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." The plurality stated that in determining if Miranda warnings were effective after an officer employed a two-stage, question-first interrogation strategy, a court should consider five factors: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second interrogation, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first round of questioning. Seibert, 542 U.S. at 615; see also State v. Dailey, 273 S.W.3d 94, 104-05 (Tenn. 2009).

The five-factor test was espoused by four justices, while a narrower test was favored by Justice Kennedy, who concurred in the result and added the fifth vote to suppress the confession at issue in that case. Seibert, 542 U.S. at 615, 618-22. Justice Kennedy rejected the plurality's multi-factor test as being too broad and stated that "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." Id. at 622. Courts are divided over which test is controlling. See Northern, 262 S.W.3d at 759-60 (detailing the disagreement over the precise analysis that Seibert mandates). We conclude, though, that the Defendant's second statement was properly admitted under either test.

With regard to the Seibert plurality's multi-factor test, the record reflects that Mr. Cooper did not ask the Defendant detailed questions during the first round of interrogation and that the Defendant was willing to speak with the police. Mr. Cooper asked the Defendant to write what the Defendant did from the time he left for work on December 25, 2001, until the police arrived at his home on December 27. Although the Defendant's first statement explained in detail what he did during this time period, the content of the two statements does not overlap. The first statement does not mention any inappropriate or sexual behavior and does not incriminate the Defendant. The Defendant stated that he was at his home during the time period in question and that he babysat the victim while her mother left the home, as requested by the victim's mother and an activity he had done many times before. The lack of questioning during the first round of interrogation and the separate content of the two statements weigh in favor of the effectiveness of the eventual Miranda warnings. The second interrogation began about fifteen minutes after the Defendant finished his first statement and was conducted in the same room. Mr. Cooper conducted the first and second interrogation but was joined by Officer Perrin during the second interrogation. The short time between the statements and the continuity of personnel weigh against the effectiveness of the Miranda warnings. With regard to the fifth factor, the second round of interrogation was demonstrably different from the first round. The first round did not involve questions from Mr. Cooper or any assertions by the Defendant or Mr. Cooper that the Defendant was involved in illegal activity. The second round involved the officer's telling the Defendant that he left items out of his first statement and the officer's questioning the Defendant about the allegations of the victim's mother and the findings of the police at the scene. The Defendant was not confronted during the second round with any previous incriminating statements, as he made no incriminating statement before being informed of his Miranda rights. The fifth factor weighs in favor of the effectiveness of the eventual Miranda warnings.

With regard to Justice Kennedy's more narrow test, the record reflects that the postwarning statements were not related to the substance of the prewarning statements. As

noted above, the content of the two statements does not overlap and the first statement does not mention any inappropriate behavior or incriminate the Defendant. We conclude that the postwarning confession was admissible under either of the Seibert approaches and that the trial court did not err in finding that the Miranda warnings administered before the Defendant was subject to express questioning were effective to safeguard the Defendant's Fifth Amendment right against self-incrimination and to ensure that his waiver of those rights was voluntary and knowing.

Although we conclude that Seibert did not bar the admission of the Defendant's postwarning statement, this does not end our inquiry. The Defendant's right against self-incrimination is also protected by article I, section 9 of the Tennessee Constitution, and the test for voluntariness of confessions under this section is said to be "broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). Our supreme court has held that the

> extraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession."

State v. Smith, 834 S.W.2d 915 (Tenn. 1992) (quoting Oregon v. Elstad, 470 U.S. 298, 335 (1985)). The crucial inquiry is whether

> the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime. In addressing these questions, courts should examine the following factors:
>
> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;
>
> 2. The temporal proximity of the prior and subsequent confessions;

3. The reading and explanation of <u>Miranda</u> rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered <u>Miranda</u> rights.

<u>Smith</u>, 834 S.W.2d at 919-20. No single factor is determinative and "a court must examine the totality of the circumstances surrounding the two confessions to determine whether the subsequent confession by the defendant can truly be termed a knowing and voluntary statement." <u>Id.</u> at 920.

Initially, the State claims the Defendant has waived this issue by not stating in his brief that article I, section 9 of the Tennessee Constitution bars admission of the statement. We disagree. The Defendant relied on both the federal and state constitutions in his motion to suppress, and the issue before us on appeal is whether the trial court erred by denying the motion to suppress. Furthermore, the Defendant relied on both the federal and state constitutions during oral argument.

The record reflects that no coercive tactics were employed to elicit the first statement given by the Defendant. The Defendant was arrested on the morning of December 27, 2001, and provided the second statement at 10:54 a.m. The Defendant was offered drinks and use of the restroom during that time. The second statement was given about fifteen minutes after the Defendant finished his first statement, but the Defendant was informed of his Miranda rights and waived those rights before he made incriminating statements and wrote the second confession.

The officers testified that the interview was conducted in a standard interview room and that they did not raise their voices or swear during the interview. Although the Defendant testified that Officer Perrin told him what to write in the second statement, the trial court accredited the officers' testimony and found that they did not tell the Defendant specific words or things to write. There is no indication that the Defendant asked to speak with family members or an attorney. Because the Defendant's first statement did not contain incriminating information and was not a confession, there was no psychological effect of having confessed that could have influenced the Defendant. The record also reflects that the Defendant was capable of understanding the Miranda warnings. He graduated from high school, attended college classes, and was not intoxicated when he gave his statements. We conclude that under the totality of the circumstances, the Defendant was able to make a free and informed choice to waive the state constitutional right not to provide evidence against himself before voluntarily confessing his involvement in the crime. We conclude that the trial court did not err by denying the motion to suppress.

**II**

The Defendant contends that the trial court erred by denying his motion for a mistrial after a witness for the State mentioned polygraphs and plea negotiations. He also contends that the trial court erred by not granting a mistrial when a witness for the State used the word "confession" to characterize the Defendant's statement to the police. The State contends that the trial court did not err because the Defendant failed to establish a manifest necessity for a mistrial. The State also contends that the Defendant has waived the issue with regard to use of the word "confession" because he made no motion for a mistrial on this ground. We conclude that the trial court did not err by denying a mistrial.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The appellant has the burden of establishing a manifest necessity warranting a mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision of whether to grant a mistrial is within the sound discretion of the trial

-24-

court.  State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  This court will not disturb that decision unless there is an abuse of discretion.  State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990).  "In reviewing for an abuse of discretion, this court has held that the following three factors should be considered:  (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof."  State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

With regard to a mistrial based on Mr. Cooper's use of the word polygraph twice, the record reflects the following exchange:

> State:  So after you took that [third] statement from Mr. Frazier, what did you do with it?
>
> Mr. Cooper:  Read it.
>
> State:  And then what did you do with it?
>
> Mr. Cooper:  I don't think that I did any real interrogation or any questioning of him that day.  I went back in and asked him if he would be willing to take a polygraph test.
>
> State:  Going back to the time of December of 2001 . . .

The State did not ask anything about the polygraph and moved on to other matters.  At a bench conference held a short time later, the Defendant moved for a mistrial based on the mention of the polygraph.  The trial court found that the State did not elicit the testimony and that the jury did not know if a polygraph test was administered or the results.  The trial court denied the motion for a mistrial and issued a curative instruction in which it told the jury that

> polygraph tests are absolutely inadmissible in these proceedings. The mere fact that the word has been used, has been mentioned, I instruct you not to draw any inference at all from that.  Nothing whatsoever.  Disregard the word . . . the reason the whole idea is inadmissible is because it's completely unreliable.  It tells you nothing . . . put that word out of your mind.  It has nothing to do with this trial.

On cross-examination, the following exchange took place:

> Defense counsel:  And it's your testimony today that you're not aware that there was a video camera in the interrogation room in the Knoxville Police Department?
>
> Mr. Cooper:  There are – at the time there was one, two, three, four interrogation rooms at the Knoxville Police Department.  I know we were not in the polygraph room, which has a video camera . . . .

Defense counsel objected and the trial court issued a second curative instruction in which it stated, "[O]nce again, that term has been used . . . .  The term has no place in this trial.  Again, I direct you to disregard it entirely . . . it has nothing to do with this trial, don't even think about the word."

The Defendant contends that a mistrial was warranted because the mention of polygraphs was in direct response to questions from the State and the State "did nothing" to avoid the testimony and did not warn Mr. Cooper not to mention polygraphs.  We disagree.  During a jury-out hearing, Mr. Cooper testified that the prosecutor informed him that polygraphs were inadmissible but that he did not know that the use of the word itself was improper.  We agree with the trial court that the State did not elicit the polygraph references.  The State also did not repeat the references in any way.  In the first instance, the State asked Mr. Cooper what he did with the Defendant's third statement, and Mr. Cooper discussed what he did after reading the statement and returning to the interview room.  The second instance occurred during cross-examination and was a reference to a room in the police department that contained a camera, not a reference to anything involving the Defendant.  The jury was not told whether the Defendant took a polygraph test or about the results.  The trial court issued curative instructions after both mentions of the word and told the jury to disregard the word entirely.

Additionally, the evidence against the Defendant was strong.  The victim's mother testified that she found the Defendant in bed with the victim, that the victim was nude from the waist down, and that the Defendant was "spooning" the victim while his pants were partially unzipped and his hand was tucked in the front waistband of his pants.  She also testified that the victim was nude from the waist down.  The victim testified that the Defendant came into her room on December 27, 2001, removed her clothing, kissed her on her neck, breasts, and vagina, and attempted to place his penis in her vagina.  She testified regarding numerous other instances of sexual abuse with the Defendant and said she did not tell anyone about the incidents because she was scared and thought she would get in trouble.  Agent Nelson testified that the Defendant's semen was found on the victim's pajama pants.

Furthermore, the Defendant confessed to the crimes in a signed statement. We conclude that the trial court did not abuse its discretion by denying a mistrial on this ground.

With regard to a mistrial based on Mr. Cooper's mention of plea negotiations, the record reflects the following exchange:

> State: Going back to the time of December of 2001, on that early morning hours of December 27, do you know if any evidence was seized?
>
> Mr. Cooper: Yes.
>
> State: Okay. And was any of that evidence tested somewhere down the road?
>
> Mr. Cooper: It was.
>
> State: Do you recall when that was?
>
> Mr. Cooper: Several years later, 2003, 2004, somewhere around that timeframe.
>
> State: Okay. And why wait so long before you tested it?
>
> Mr. Cooper: At the time we had what I believed was a true confession from Mr. Frazier. There was – from my recollection, there was a discussion about a plea deal, so we didn't feel that it was necessary to –

The Defendant objected and requested a curative instruction. The trial court found that the State did not elicit the testimony and issued a curative instruction in which it told the jury that

> in the development of criminal prosecutions, there are all kinds of different discussions . . . . None of those discussions or anything that might have been said in any such discussion has any place in this trial. That is not something for you to consider or to be concerned about in any way . . . . Only what's presented in this courtroom is for your consideration.

The Defendant moved for a mistrial. The trial court denied the motion and issued an additional curative instruction in which it told the jury to base their verdict entirely upon evidence introduced in court and to disregard anything said outside the courtroom.

The Defendant contends that the mention of plea negotiations warranted a mistrial because the testimony was in direct response to questions from the State and the State "did nothing" to avoid the testimony. He also argues that the jury's will was "overridden" by the inadmissible testimony and that the outcome of the trial "might have been" better but for the testimony. We disagree. During a jury-out hearing, Mr. Cooper testified that he told the prosecutors before the trial that the evidence was not immediately tested because the police had a confession and felt that was all they needed, but he admitted he mentioned to the prosecutor that the plea negotiations factored into the delay. Mr. Cooper said he was not instructed to say that the delay was caused by plea negotiations. We agree with the trial court that the mention of plea negotiations was not deliberately elicited by the State. The trial court issued two curative instructions in which it told the jury to base its verdict on evidence admitted at the trial and to disregard anything said by lawyers outside the courtroom. As noted above, the evidence against the Petitioner was strong. Furthermore, the record reflects that the jury's will was not overcome by the testimony. The jury was not informed of the substance of any plea negotiations or if the Defendant wanted to accept a plea agreement. The jury found the Defendant guilty of two lesser included offenses and found him not guilty of seven additional charges. The Defendant has has not explained how the trial could have differed had Mr. Cooper not made a single brief reference to the fact that plea negotiations occurred. We conclude that the trial court did not abuse its discretion by denying a mistrial on this ground.

With regard to a mistrial based on Mr. Cooper's characterization of the Defendant's statements as a confession, the State argues that the Defendant has waived consideration of this issue by failing to request a mistrial after Mr. Cooper used the word confession. On direct examination, Mr. Cooper referred to the Defendant's second statement to the police as a confession. The Defendant objected to the use of the term because a confession was "not what we're talking about here," but did not request a mistrial or a curative instruction. No additional discussion of the term or objection to use of the term occurred, despite subsequent use of the term by Mr. Cooper. Additionally, defense counsel used the term during his questioning of Mr. Cooper and the Defendant used the term in his third statement to the police. The trial court cannot be faulted for not granting a mistrial on this ground when the Defendant did not request a mistrial on this ground, alert the court that a mistrial was warranted, or refrain from using the term himself. See T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Wanda Hinson, No. M2000-02762-CCA-R3-CD, Lewis County,

slip op. at 7 (Tenn. Crim. App. Sept. 27, 2002) (concluding that although a defendant objected to improper impeachment evidence, his failure to move for a mistrial waived consideration on appeal of whether the trial court erred by refusing to grant a mistrial due to the improper impeachment) (citing T.R.A.P. 36(a)), perm. app. denied (Tenn. Feb. 18, 2003).

Despite this, we will review whether the trial court committed plain error by failing to declare a mistrial sua sponte based on Mr. Cooper's use of the word "confession." See T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time"). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment. . . ." T.R.A.P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

The record reflects that on the morning of the trial, in response to a pretrial motion filed by the Defendant, the trial court stated, "during the presentment of the evidence, I'm not sure it's a compelling issue, but the Court would ask that you not call [the Defendant's statement] a confession. Certainly when you argue, you can argue that it's a confession." The Defendant asked that witnesses also be barred from using the term, and the trial court stated, "I'm asking the State's attorney not to try to elicit the word confession . . . . If a witness comes up with it on his or her own . . . we'll just face that when we have to."

The Defendant points to two instances of a witness's use of the term "confession" that created a manifest necessity warranting a mistrial. During the direct examination of Mr. Cooper, the State asked if Mr. Cooper saw the Defendant after the Defendant provided his initial statements, and Mr. Cooper said, "Several months later he called and wanted to come

-29-

in and recant his confession and give another statement." The Defendant objected to the use of the terms "recant" and "confession." The trial court noted that the State did not use the term and instructed the State to phrase its questions carefully. Later during direct examination, the State asked Mr. Cooper why the evidence was not tested until years after it was seized. Mr. Cooper said, "At the time we had what I believed was a true confession from [the Defendant] . . . there was a discussion about a plea deal, so we didn't feel that it was necessary . . . ." The Defendant objected to the mention of a plea deal, but not to the use of the word confession.

This court has held that a trial court's use of the term "confession" during jury instructions to characterize a defendant's admission of criminal activity does not necessarily warrant a mistrial. See State v. Thomas L. Jones, No. W2000-01028-CCA-R3-CD, Shelby County, slip op. at 5 (Tenn. Crim. App. Sept. 24, 2001), perm. app. denied (Tenn. Mar. 4, 2002). Although the use of the term will not generally create a manifest necessity for a mistrial, the trial court in this case instructed the State not to refer to the Defendant's statements to the police as a confession or intentionally elicit the term from witnesses. The record reflects that the State asked if Mr. Cooper saw the Defendant after the initial statements and the reason for a delay in testing the evidence. Although the first question did not call for a response using the term confession, the State noted during a jury-out hearing that it expected Mr. Cooper to state that he did not immediately test the evidence because he "had a confession and felt like that's all we needed at that point." While it appears that the State knew Mr. Cooper was likely to use the term in response to the second question, the Defendant did not object to the use of the term in the second answer. The Defendant did not request a curative instruction after either use of the term, and none was issued.

Additionally, the Defendant did not take issue with earlier uses of the term during direct examination, defense counsel used the term during cross-examination, and the Defendant used the term in his third statement to the police. During the direct examination of Mr. Cooper, before the Defendant's objection to use of the term, the following exchanges took place:

> State: What did you say to [the Defendant] after he breaks down and started crying?
>
> Mr. Cooper: He started talking about his background a little bit . . . . And within a few minutes from that he had - - he'd confessed.
>
> . . .

> State: . . . he admitted pretty quickly after he went back in
> there?
>
> Mr. Cooper: He did.
>
> State: Compared to other people who confess, was it - -
>
> Mr. Cooper: It was extremely quick.

The Defendant did not object to these statements. On cross-examination, the following exchange took place:

> Defense Counsel: You've never heard of an innocent man
> giving an admission?
>
> Mr. Cooper: An admission or a confession?
>
> Defense Counsel: Well, a confession, I'll say it that way.
> You've never heard of an innocent man making a confession?

In his third statement to the police, which was read to the jury by Mr. Cooper, the Defendant characterized his initial statements to the police as a confession and stated, "As to why I confessed to raping [the victim], at first I was confused about everything . . . I confessed to raping her even though I couldn't remember anything."

The Defendant does not indicate why a witness's use of the term undermined his ability to receive a fair trial while his own use of the term was permissible, and he has failed to established that there was a manifest necessity warranting a mistrial. The record does not reflect that a substantial right of the Defendant was adversely affected or that the use of the term more probably than not affected the judgment. We conclude that the trial court did not err by failing to grant a mistrial. The Defendant is not entitled to relief on this claim.

The Defendant also argues that the combination of errors at the trial created a manifest necessity for a mistrial that required the trial court to grant his motion. Having determined the trial court did not abuse its discretion by denying a mistrial or otherwise err during the trial, we conclude that the Defendant is not entitled to relief.

# III

The Defendant contends that the trial court erred by refusing to give a "reverse flight" instruction in which the jury would be instructed that it could infer a lack of a guilty conscience if the evidence established that the Defendant knew he was a suspect and chose not to flee. The State contends that the trial court did not err by refusing to give the instruction. We agree with the State.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). "A trial court should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994).

The trial court found that the Defendant's proposed instruction was not a correct statement of the law. It found that the Defendant was presumed to be innocent of all charges and that no law granted him "an additional inference of innocence merely because he complied with the law requiring him to stand trial." In instructing the jury, the trial court stated the Defendant was entitled to a presumption of innocence during all stages of the trial. The Defendant does not contend that the jury instructions issued by the trial court failed to submit the legal issues fairly or misled the jury as to the applicable law. He has presented no authority to support his claim that a reverse flight instruction was a correct statement of law or a permissible inference, and this court has found nothing to support the instruction. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE